**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

November 13, 2018

**BY ECF**
The Honorable P. Kevin Castel
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

> Re:   United States v. Michael Little, S2 12 Cr. 647 (PKC)

Dear Judge Castel:

The sentencing of defendant Michael Little is scheduled to proceed on November 20, 2018, at 11:30 a.m.  The Government respectfully submits that the Guidelines calculations contained in the Presentence Report ("PSR") are accurate, that an additional two-level enhancement applies under U.S.S.G. Section 3C1.1 based on the defendant's efforts to obstruct justice, and that the resulting applicable Guidelines range in this case is 121 to 151 months' imprisonment.  (PSR ¶ 86).  For the reasons set forth below, the Government respectfully submits that a sentence within that range is appropriate in this case.

## Background

### A.  Indictment

On March 18, 2013, a grand jury in this District returned a second superseding indictment, S2 12 Cr. 647 (PKC) (the "Indictment"), charging the defendant with obstructing and impeding the due administration of the internal revenue laws, failing to file individual income tax returns, failing to file FBARs, conspiracy, and aiding and assisting the preparation of false IRS forms.  On March 19, 2018, trial commenced.

### B.  Trial

The record at trial established that, over the span of more than a decade, the defendant participated in multiple schemes designed to evade paying taxes and to obstruct an IRS investigation into his conduct and the conduct of his co-conspirators.

#### 1.  Conspiracy With the Seggerman Family

At trial, the Government offered the testimony of three cooperating witnesses, the siblings Yvonne, Henry, and Suzanne Seggerman.  In addition, the defendant called a fourth

cooperating witness, John Seggerman, as part of his defense case.  Those four cooperating witnesses testified that, in 2001, their father passed away and left them—along with their mother and a disabled sister—a multi-million dollar offshore inheritance.  (*See, e.g.*, PSR ¶ 14; Tr. at 171 (Testimony of Y. Beauregard Seggerman)).  The Seggerman siblings testified that the defendant, along with Dr. Müllhaupt, assisted the family in maintaining, and repatriating, offshore assets so as to evade detection by the IRS.  (*See, e.g.,* PSR ¶ 14; Tr. at 172, 221-23) (Testimony of Y. Beauregard Seggerman); Tr. at 491, 535 (Testimony of H. Seggerman); Tr. at 761-62 (Testimony of S. Seggerman); Tr. at 1634-35, 1666-67 (Testimony of J. Seggerman)).

Among other things, the defendant participated in a 2001 meeting at the Four Seasons Hotel in Manhattan.  At that meeting, he explained how he could assist the Seggerman family in repatriating their inheritance without IRS detection.  (PSR ¶ 18; Tr. at 196 (Y. Beauregard Testimony)).  The defendant told the meeting attendees how to hide the money from the IRS—for example, by advising them that they should never wire money directly into the United States because the IRS monitored wire transfers.  (PSR ¶ 18; GX-103 at 5 (Beauregard's contemporaneous notes of the Four Seasons meeting); Tr. at 211).  The defendant told the Seggermans that his accountant, Bob Gordon, could help hide repatriated offshore funds by categorizing those cash flows on a tax return as income from, for example, the sale of jewelry or a painting.  (PSR ¶ 18; GX-103 at 7; Tr. at 221-22).  The defendant further explained that he and Gordon "would get money into the United States, but they would not explain to us how they did it.  They would get it into [Anne Seggerman's] account so she could access it tax free but need to know basis, like none of you kids need to know how this actually is enacted."  (PSR ¶ 18; GX-103 at 8; Tr. at 226).

In addition, on January 25, 2002, the defendant asked Yvonne Seggerman Beauregard to become a one-percent owner in Steiner Productions—an inactive film production company through which the defendant and Müllhaupt funneled Anne Seggerman's undeclared offshore funds.  (*See* PSR ¶ 19; GX-111 (Beauregard's contemporaneous notes of the January 25, 2002 meeting); Tr. at 249-50).  Before making the request, the defendant asked Ms. Beauregard to stop taking notes.  (PSR ¶ 19; Tr. at 251).  He then asked questions about her employment and stated, "We would like to pick the family member who is least likely to draw any attention to themselves because they're gainfully employed and least likely to draw IRS scrutiny on their activities.  We would like you to become a one-percent owner of Steiner Productions. Yes or no?"  (PSR ¶ 19; Tr. at 252).  Bob Gordon then entered the conversation and Gordon and the defendant explained to Ms. Beauregard the importance of preparing the Steiner Productions tax returns so as not to invite IRS scrutiny.  (PSR ¶ 19; Tr. at 289).  The defendant also referred Suzanne Seggerman to Bob Gordon so that she could set up a structure similar to Steiner Productions that would disguise her repatriated offshore funds.  (PSR ¶ 19; GX-308; GX-2513; Tr. at 572).

For assisting the Seggerman family in hiding and repatriating their offshore funds, the defendant charged over a half a million dollars in fees, which were taken from the Lixam trust account.  (*See* PSR ¶ 19; GX-112; GX-402).

### 2.   The Defendant's Willful Failure to File Tax Returns

At trial, the evidence showed that the defendant—a citizen of the United Kingdom and a lawful permanent resident of the United States ("LPR") since 1972—earned substantial income between 2005 and 2010, much of it while living and working in New York City between 2005 and 2008.  The evidence further showed that the defendant failed to file tax returns for those years, in either the United States or the United Kingdom.[1]  (*See* PSR ¶¶ 22-28).

In addition to the hundreds of thousands of dollars the defendant earned in legitimate income, between 2005 and 2010, the defendant earned a total of over $300,000 in income related to his role in managing the Lixam trust account for Anne Seggerman.  (*See* PSR ¶ 25; Tr. at 1224; GX-400).  All told, between 2005 and 2010, the defendant took in over $670,000 in gross income, earning substantially more than the IRS threshold filing requirement for each tax year.[2]  (*See* PSR ¶ 25; GXs-400, 401).

### 3.   The Defendant's Attempt to Obstruct an IRS Investigation by Causing False Tax Forms to be Filed

Following Harry Seggerman's death and according to his plan, the defendant and Walter Müllhaupt caused approximately $6.5 million of undeclared assets from Harry Seggerman's estate, which had been held in overseas accounts, to be transferred to Lixam, to be held in trust for Anne Seggerman.  The defendant and Müllhaupt were the sole directors of Lixam and the sole signatories on the bank accounts opened to hold those assets.  Starting in 2001 and continuing into 2010, the defendant and Müllhaupt surreptitiously transferred over $3 million from the Lixam accounts in Switzerland to Anne Seggerman in the United States without notifying the IRS.  (*See* PSR ¶ 29).

The evidence at trial established that in or about July 2010, the defendant learned that Anne Seggerman had been contacted by IRS agents, who served her with a grand jury subpoena seeking information and documents relating to, among other things, Anne's foreign bank and financial accounts.  (*See* PSR ¶ 30; GX-554; Tr. at 1040-41).[3]  Shortly after learning that Anne had been subpoenaed, the defendant took steps to falsely and fraudulently portray the transfers of funds from Lixam to Anne as "gifts" made by Müllhaupt as a result of Müllhaupt's detached generosity and desire to provide unsolicited financial assistance to Anne.  (*See* PSR ¶ 30).

---

[1] The defendant eventually filed tax returns in the U.K. for those years, but only after he was indicted on tax charges in the United States in 2013.

[2]  As summary witness DeLeassa Penland testified, the summary chart admitted into evidence as Government Exhibit 401 used the annual filing threshold for head of household status, which was the highest and most conservative threshold amount (as compared to single, married filing jointly, and married filing separately).  (Tr. at 1225-26).

[3]  The evidence established that the defendant first learned of an IRS investigation in January 2010 when Yvonne Seggerman advised him that her sister Suzanne Seggerman had received subpoenas from the Government.  (Tr. at 300).

As a result of his efforts, between 2010 and 2012, the defendant caused Anne Seggerman's accountants and a tax attorney, Doug Stein, to prepare, on behalf of Anne Seggerman, IRS Forms 3520 (Annual Return to Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts) for the tax years 2001 to 2010. Those Forms 3520, which were filed with the IRS between November 2010 and January 2012, falsely reported that the funds transferred to Anne during the calendar years 2001 to 2010 from the trust accounts holding the funds she inherited from her late husband—totaling over $3 million—were "gifts" to Anne from a foreign person. In fact, the proof at trial overwhelmingly established that the transferred funds were Anne's inheritance from her late husband's undeclared offshore estate. (PSR ¶ 32).

Before the Forms 3520 were filed with the IRS, the defendant, directly and through Bainton, repeatedly and falsely advised Stein and the accountants—in emails and during telephone conversations—that the funds transferred to Anne were gifts from a wealthy benefactor.

For example, in October 2011, as the accountants were in the process of preparing the Forms 3520, they submitted a series of questions in an email to the defendant and Stein in order to clarify the nature of the monies received by Steiner Productions and Anne Seggerman in order to accurately prepare the Forms 3520. (PSR ¶ 38; Tr. at 1388-90; GX-1226). The defendant responded by email confirming that the funds received by Steiner Productions and Anne were a "pure gift" from a "non-U.S. person." (PSR ¶ 38; Tr. at 1391-92; GX-325).

Shortly thereafter, the defendant sent a separate letter addressed to the accountants, purportedly for the purpose of "provid[ing] background information in regard to the tax affairs of Anne Seggerman." (*See* GX-1230). In the letter, the defendant again represented that the funds received by Anne Seggerman were a "gift" from Müllhaupt, and that Müllhaupt was the "sole legal owner" of the funds in Lixam. (PSR ¶ 38; Tr. at 1393-94; GX-1230).

Based on the representations made to them by the defendant, the accountants prepared the Forms 3520 for calendar years 2001 through 2010, which stated that the funds transferred to Steiner Productions and Anne Seggerman were gifts. (PSR ¶ 39; Tr. at 1400-01). Those false returns were subsequently filed with the IRS. (PSR ¶ 39; Tr. at 125-34; GXs-1608-1627).

## C. Verdict

On April 10, 2018, after a three-week trial, the jury found the defendant guilty on all nineteen counts of the Indictment. (*See* Tr. at 2340-43).

## <u>The Applicable Guidelines Sentencing Range</u>

As set forth below, the defendant's offense level is 32, and his Criminal History Category is I, resulting in an applicable Guidelines sentencing range of 121 to 151 months' imprisonment.[4]

### A.     The Loss Amount

Pursuant to U.S.S.G. Section 2T1.1(a), the base offense level corresponds to the "tax loss." The Guidelines provide that "in determining the total tax loss attributable to the offense, all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. 2T1.1, application note 2.

If the relevant crime involves "failure to file a tax return, the tax loss is the amount of tax that the taxpayer owed and did not pay." U.S.S.G. § 2T1.1(c)(2). Application note A to that Guidelines provision provides that "[i]f the offense involved failure to file a tax return, the tax loss shall be treated as equal to 20% of the gross income . . . less any tax withheld or otherwise paid, unless a more accurate determination of the tax loss can be made."

At trial, Special Agent DeLeassa Penland, a former IRS Revenue Agent, testified that she had calculated the tax loss to the United States as a result of Harry Seggerman's under-reported estate to be $4,218,140. (*See* GX-403; Tr. at 1236-37). In addition, Agent Penland calculated the defendant's total unreported income for the years 2005 to 2010 to be $672,248.55. (*See* GX-400). Twenty percent of the defendant's gross income for the charged time period is $134,449.71. The total tax loss amount attributable to the defendant is therefore $4,352,589.71, and the base offense level is 24. *See* U.S.S.G. 2T4.1 (Tax Table).

The defendant argues that the "tax loss amount is $0." (Def.'s Sub. at 50). He contends that the Government "failed to prove I was part of a conspiracy to under-report estate taxes and introduced no evidence to support my involvement in filing Harry Seggerman's estate taxes." (*Id.*).

Each defendant in a "jointly undertaken criminal activity" is accountable for his own conduct and for "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." USSG § 1B1.3(a)(1)(B).

Here, there is ample evidence that his co-conspirators' conduct regarding the estate tax return was reasonably foreseeable to the defendant. The defendant understood that the purpose of the Lixam trust and other offshore accounts was to hide Harry Seggerman's estate from the U.S.

---

[4] At the time the Government provided its case summary to the Probation Department, the November 1, 2016 edition of the U.S. Sentencing Guidelines were in effect. The November 1, 2018 edition of the U.S. Sentencing Guidelines are applicable for the defendant's sentencing, which is scheduled to take place on November 20, 2018. However, there have been no changes to the provisions which are relevant to the Guidelines calculation in this case.

government.  As discussed above, at the meeting at the Four Seasons Hotel, the defendant told the Seggermans how to hide the money from the IRS—for example, by advising them that they should never wire money directly into the United States because the IRS monitored wire transfers.  (PSR ¶ 18; GX-103 at 5 (Beauregard's contemporaneous notes of the Four Seasons meeting); Tr. at 211).  The defendant told the Seggermans that his accountant, Bob Gordon, could help hide repatriated offshore funds by categorizing those cash flows on a tax return as income from, for example, the sale of jewelry or a painting.  (PSR ¶ 18; GX-103 at 7; Tr. at 221-22).  A clear and reasonable inference to be drawn from the trial record is that the defendant—despite not actively preparing the estate tax return—knew that his co-conspirators (who were going to great lengths to hide the estate from the U.S. government) were not planning on accurately reporting the true value of Harry Seggerman's estate to the United States.  The defendant is therefore responsible for the reasonably foreseeable conduct committed by his co-conspirators as part of the criminal conspiracy in which he also participated.[5]  *See United States v. Charroux*, 3 F.3d 827, 838 (5th Cir. 1993) (affirming the district court's decision to hold each defendant responsible not only for the tax loss which he caused, but also for the tax loss caused by his co-defendant).

The defendant also argues that the twenty-percent of gross income calculation provided for in U.S.S.G. Section 2T1.1(c)(2)(A) is not appropriate because the HMRC and the IRS "pursuant to the provisions of a Mutual Assistance Protocol within the US/UK Tax Treaty are in the process of calculating an accurate determination of the tax loss to the US Treasury."  (Def.'s Sub. at 51).

The defendant has offered no "more accurate determination" of the tax loss, and it appears there is no "more accurate determination" available.  Indeed, his own argument exemplifies why the Court should calculate the loss resulting from his failure to file tax returns using the formula provided in Section 2T1.1(c)(2)(A).  Calculating the tax loss for the defendant's failure to file tax return implicates an array of cross-national laws, regulations, and treaty provisions.  Given that there is no "more accurate determination" available, the formula provided in Section 2T1.1(c)(2)(A) is the appropriate calculation of the tax loss resulting from the defendant's failure to file tax returns.[6]

The base offense level is therefore 24.

### B.    The "Sophisticated Means" Enhancement is Warranted

The Guidelines provide for a two-level enhancement when a tax offense involves "sophisticated means."  U.S.S.G. § 2T1.1(b)(2).  The Guidelines further provide that "sophisticated means" encompasses conduct "such as hiding assets or transactions or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."  U.S.S.G. § 2T1.1, application note 5.  The enhancement "does not require a brilliant scheme, just one that displays a

---

[5] For restitution purposes, the defendant will be held jointly and severally liable with his co-conspirators, including the Seggerman children, for the loss resulting from the false estate tax return.

[6] In any event, when added to the tax loss for the false estate tax return, the loss from the failure to file tax returns does not increase the offense level.  The tax loss amount remains between $3.5 million and $9.5 million.  *See* U.S.S.G. § 2T4.1.

greater level of planning or concealment than the usual tax evasion case." *United States v. O'Doherty*, 643 F.3d 209, 220 (7th Cir. 2011) (quoting *United States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006)).

The offense conduct here indisputably involved the use of multiple offshore accounts, by both the Seggermans (*e.g.*, the Lixam trust) and by the defendant personally (*e.g.*, his Peahen account in Guernsey). In addition, the method by which the defendant and Walter Müllhaupt moved Anne's inheritance back into the United States also constitutes sophisticated means. The defendant and Müllhaupt used a Swiss trust (which was not held in Anne Seggerman's true name) to wire payments through, first, an attorney account, and then to a dormant film production company in the United States. (*See* GX-405 (depicting flow of funds from Lixam to Anne Seggerman)). Little and his accountant, Bob Gordon, then directed the Seggermans to disguise the inflow of funds as business expenses. (*See* Tr. at 287-88).

The defendant claims that no "fictitious entities were used by me" and that "[a]ll transfers made to Anne were by normal wire transfer and the international fund managers engaged to manage Lixam's funds were informed of Lixam trustee's role in providing support to Anne." (Def.'s Sub. at 51). The defendant makes no mention of the extensive use of offshore bank accounts (in locations known as tax havens) as part of the criminal conduct. Nor is the fact that funds were wired to Steiner Productions via "normal wire transfer" availing. The defendant never confronts the fact that the entities sending and receiving the wire transfers were used (and in some instances, created) expressly for the purpose of obfuscating the true owner of the funds.

The Guidelines note that this enhancement has been included in the Guidelines because use of sophisticated means, such as the use of offshore accounts, "decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes." U.S.S.G. 2T1.1, Background. Indeed, were it not for the U.S. government forcing UBS to disclose the names of thousands of U.S. tax evaders (one of whom was Suzanne Seggerman), none of this criminal conduct would likely ever have been uncovered. The enhancement is plainly appropriate here. *See United States v. Benham*, 2011 WL 10647664, at *2 (6th Cir. Apr. 14, 2011) (affirming the district court's application of the sophisticated means enhancement where the defendant "us[ed] offshore accounts and form[ed] alter-ego corporations").

## C.     An Enhancement is Appropriate for Failure to Report Income Over $10,000 from Criminal Activity

The Guidelines provide for a two-level enhancement if the defendant "failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." U.S.S.G. § 2T1.1(b)(1). "Criminal activity" refers to "any conduct constituting a criminal offense under federal, state, local, or foreign law." U.S.S.G. § 2T1.1(b)(1), application note 4.

As established at trial, between 2002 and 2011, the defendant received over half a million dollars in income for managing the Lixam trust and facilitating payments from Lixam to Steiner Productions. (*See* GX-402).

The defendant claims, inaccurately and in conclusory fashion, that the Government

"adduced no evidence at trial that payments to me from Lixam were derived from criminal activity." (Def.'s Sub. at 51). To the contrary, multiple cooperating witnesses testified that the defendant was paid to manage and repatriate the Lixam funds in a way that kept those funds hidden from the IRS. The defendant's income from Lixam was thus derived from the criminal conspiracy charged in Count Nine. This enhancement is appropriate.

### D.    The "Use of a Special Skill" Enhancement is Warranted

The Guidelines provide for a two-level enhancement if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. "Special skill" refers to "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3, application note 4. The Second Circuit has concluded that "[t]he fact that the same offenses could have been committed by a person without the defendant's special training is immaterial; a [section] 3B1.3 adjustment is proper where the defendant's special skills increase his chances of succeeding or of avoiding detection." *United States v. Fritzson*, 979 F.2d 21, 22 (2d Cir. 1992).

The defendant claims this enhancement is unwarranted because "I did not act as an attorney or use any special legal skill to facilitate the offenses of which I was convicted. In my position as a trustee, I instructed attorneys and relied on their skill and advice." (Def.'s Sub. at 51).

Despite the defendant's claim that he "did not act as an attorney" in committing this crime, when Anne Seggerman received a grand jury subpoena in July of 2018, the defendant informed the IRS agent assigned to the case that *he* would be representing Anne and Patricia Seggerman. (*See* GX-554). On or about August 11, 2010, in email correspondence to the Government, the defendant stated that "I may be required to move to have the subpoena re-issued as the present document appears overly broad in its scope." (*See* GX-554). In that same email, the defendant expressed shock "to hear that I am a suspect in your ongoing criminal investigation." (*See id.*). Less than a week later, attorney Joseph Bainton—who had worked closely with the defendant in the past—sent an email to Doug Stein with "hypothetical" questions about a widow who received payments as a "gift" from a Swiss attorney trust account—thus beginning the attempted cover-up for which the defendant was ultimately convicted. (*See* GX-501).

The defendant also used his position as an attorney to secure the trust of the accountants and Doug Stein. Doug Stein testified that he believed that the defendant was acting as Anne Seggerman's "agent and attorney" (Tr. at 1159), not as a trustee for Lixam. Much of the correspondence sent from the defendant to Stein was written with the email signature "Michael J. Little, Esq., Solicitor & Attorney at Law" and purports to be from the "Law Office of Michael J. Little, Esq." (*See e.g.*, GX-516, 532).

In addition, the defendant sent a key piece of correspondence—the letter to the accountants assuaging their concerns that there was no evidence that the payments were a "gift"—on his legal letterhead and signed it as "Michael J. Little, Solicitor of the Supreme Court of England & Wales." (*See* GX-535). Text across the bottom of the letter reads "Regulated by the Solicitors Regulation Authority Number 514740." As with Stein, the accountants working on the matter understood the

defendant to be acting as an attorney.  (*See* GX-1205; Tr. at 1369 (notes of a phone call between accountant and the defendant noting that "Per discussion with attorney Little, there was confusion as to foreign gift versus trust.  Attorney Little clarified it was a foreign gift not a foreign trust as stated in my prior notes on August 13, 2010.")).

The record therefore supports the imposition of this enhancement.  The defendant first attempted to represent Anne Seggerman in connection with her grand jury subpoena, then engaged in a cover-up in which he held himself out as an attorney and used the imprimatur of his position to secure the trust of others—trust that the defendant needed in order to sell the story that the millions of dollars in funds flowing from Switzerland were simply gifts from a benefactor.

### E.    An Enhancement is Warranted for Obstruction of Justice because the Defendant Committed Perjury at Trial

Little attempted to obstruct and impede justice during his trial when he testified in his own defense and committed perjury in the process.  Under Section 3C1.1 of the Sentencing Guidelines, this conduct should result in a two-level enhancement in the calculation of the defendant's Guidelines sentencing range.  The Court should also consider this conduct in its evaluation of the 18 U.S.C. § 3553(a) sentencing factors.

Little testified at trial in his own defense over the course of three days.  The gist of his testimony was that he lacked the requisite intent to be guilty of any wrongdoing.  During his testimony, the defendant made numerous materially false statements that constitute perjury and warrant the application of the obstruction-of-justice enhancement.  Indeed, a number of matters about which the defendant testified were directly contradicted by ample evidence at trial and by the jury's verdict.  Among other things, the defendant falsely testified that he never participated in a conspiracy to defraud the IRS and never intended to violate the law or the rules of the IRS.

#### 1.    Applicable Law

Section 3C1.1 of the Guidelines provides for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense."  U.S.S.G. § 3C1.1.  This provision applies to a defendant who commits perjury, or who provides "materially false information to a judge or magistrate."  *Id.*, comment. (nn. 4(b), 4(f)).

Where the Government moves for a Section 3C1.1 enhancement based on a defendant's perjured testimony, "a sentencing court must find that the defendant 1) willfully and 2) materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997).  To satisfy the willfulness requirement, the Government must prove that "the defendant's statements unambiguously demonstrate an intent to obstruct."  *United States v. Kelly*, 147 F.3d 172, 178-79 (2d Cir. 1998).  The commentary to Section 3C1.1 further defines "material" evidence to mean "evidence, fact, statement or information that, if believed, would tend to affect or influence the issue under determination." U.S.S.G. § 3C1.1, comment. (n.6).

In the case of a defendant's trial testimony, perjury may be established by testimony inconsistent with the jury's verdict. As the Second Circuit explained in *United States v. Bonds*, 933 F.2d 152 (2d Cir. 1991), it is appropriate to regard the jury's verdict as having "necessarily determined" the intentional falsity of a defendant's testimony when: (1) the defendant testified that he lacked guilty knowledge; and (2) the jury subsequently convicts the defendant. *See id.* at 155.[7] Moreover, where the false testimony "concern[s] [the defendant's] own state of mind – a matter about which he was peculiarly knowledgeable" – it is "reasonable to conclude" that the defendant "was aware, at the time of testifying, that his statements were untrue." *See id.*

Finally, it is well settled that "the obstruction of justice enhancement [under Section 3C1.1] . . . is mandatory once its factual predicates have been established." *United States v. Friedman*, 998 F.2d 53, 58 (2d Cir. 1993); *accord United States v. Ortiz*, 251 F.3d 305, 306 (2d Cir. 2001). Accordingly, if the sentencing judge finds facts that give rise to this enhancement, the enhancement must be imposed.

### 2.    Discussion

The defendant intentionally testified falsely and committed perjury when he testified, among other things: (1) that he "did not conspire with the Seggermans to break the rules of the IRS" (Tr. 1715); (2) that, at the Four Seasons meeting on August 8, 2001, he did not among other things, (a) "tell anyone how to evade the IRS" (Tr. 1797); (b) "give concrete methods on how to evade tax consequences" (*Id.*); and (c) "suggest to anyone that day to break the law of the United States" (Tr. 1798); (3) that when he went to the Four Seasons meeting, it was not his "intent at all to help any of the Seggermans break the rules of the IRS . . . [and] laws of the United States of America" (Tr. 1788); (4) that, with respect to the filing of the Forms 3520 for Anne Seggerman, he did not intend to "break the laws of the United States," "try to cover [his] tracks in some type of tax-evasion scheme," "willfully try[  ] to break the rules of the IRS," or "take any action to willfully obstruct the IRS in any way" (Tr. 1879-80); (5) that he "[d]id not intentionally break the rules of the IRS in regard to [his] own personal finances" (Tr. 1715); (6) that he was not "intentionally trying to break any laws of the United States" or "intentionally trying to break the rules of the IRS" when he failed to file his federal tax returns from 2005 to 2010 (Tr. 1901, 1905);

[7] Along these lines, a guilty verdict "'binds the sentencing court to accept the facts necessarily implicit in the verdict.'" *United States v. Hourihan*, 66 F.3d 458, 465 (2d Cir. 1995) (quoting *United States v. Weston*, 960 F.2d 212, 218 (1st Cir. 1992), *abrogated on other grounds, Stinson v. United States*, 508 U.S. 36 (1993)); *see United States v. Bonds*, 933 F.2d at 155; *see also United States v. Brown*, 311 F.3d 886, 889 (8th Cir. 2002) (affirming obstruction-of-justice enhancement where the defendant "testified on the central issues at trial, and the presentence report identified specific ways that testimony was contrary to the jury's verdict"); *United States v. Johnson*, 302 F.3d 139, 154 (3d Cir. 2002) ("Because several portions of Johnson's sworn testimony [including his denial of knowledge that his coat contained narcotics] were irreconcilably inconsistent with the jury's verdict, we cannot conclude that the District Court clearly erred in finding that a § 3C1.1 enhancement was required."); *United States v. Esparza*, 291 F.3d 1052, 1055 (8th Cir. 2002) (enhancement affirmed "without an explicit finding of perjury by the district court" where the defendant's "testimony [that he did not know his trailer contained narcotics] was obviously material and plainly inconsistent with the jury's verdict").

(7) that he did not "believe" that he was "under a legal obligation to file any type of tax return with the IRS" (Tr. 1904); (8) that he did not "willfully try to evade or break the rules of the IRS by not filing any tax returns in the years 2005 to 2010"  (Tr. 1905); (9) that he did not "willfully violate the rules of the IRS by not filing an FBAR" (Tr. 1905); and (10) that he did not "willfully" try to break the laws of the United States" as he was charged (Tr. 1911).

The Government's evidence at trial and the jury's ultimate findings—that the defendant was guilty of obstructing and impeding the IRS, as charged in Count One, failing to file his Individual Income Tax Returns for tax years 2005 through 2010, as charged in Counts Two through Seven, failing to file FBARs, as charged in Count Eight, conspiring to defraud the IRS, as charged in Count Nine, and aiding and assisting the preparation of false IRS Forms 3520, as charged in Counts Ten through Nineteen—support the finding that the defendant willfully perjured himself at trial with respect to the above cited testimony.  *See Bonds*, 933 F.2d at 155 ("Where, as here, the defendant's testimony relates to an essential element of his offense, such as his state of mind or his participation in the acts charged in the indictment, the judgment of conviction necessarily constitutes a finding that the contested testimony was false.").

The falsity of the defendant's claim—that he "did not conspire with the Seggermans to break the rules of the IRS" (Tr. 1715)—and the other statements he made about the August 8, 2001 Four Seasons meeting listed above, was proven by, among other things, the testimony of the three cooperating witnesses called by the Government, Yvonne, Henry, and Suzanne Seggerman and by a fourth cooperating witness, John Seggerman, who was called by the defense.  In particular, Yvonne Seggerman testified, among other things, that during the Four Seasons meeting, the defendant counseled and advised the Seggermans, on methods of repatriating their inherited money to avoid IRS detection, including by bringing the inherited money into the United States from Switzerland in "little chunks" of less than $10,000 and through traveler checks, intellectual property rights, paintings and jewelry.  (Tr. 221-23).  That testimony was corroborated by her contemporaneously transcribed handwritten notes of the meeting (*See* GX 103), and the testimony of Suzanne and John Seggerman.[8]  The Seggerman witnesses also testified about the defendant's role in causing millions of dollars from their undeclared foreign entities and accounts and those of their mother, Anne Seggerman, to be wire-transferred into accounts owned by them and their mother in the United States in ways to evade detection by the IRS.  The evidence established that, over a nine-year period, over $3 million dollars was wire-transferred into an account controlled by Anne and Yvonne Seggerman to pay Anne's living expenses.

The jury's finding that the defendant was guilty of Count Nine further supports the finding that the defendant willfully perjured himself at trial by claiming that he "did not conspire with the Seggermans to break the rules of the IRS."  That statement was necessarily inconsistent with the

---

[8]  Suzanne Seggerman testified that at the Four Seasons meeting the defendant told them, among other things, that they should not report the offshore money on their tax returns and, in repatriating their inheritance, they should bring less than $10,000 in cash into the United States or bring it into the United States in the form of artwork, jewelry, or intellectual property.  (Tr. 762-63).  John Seggerman testified that during the Four Seasons meeting the defendant pulled a credit card out and advising the Seggermans that they could access their offshore accounts holding their inheritance by using a credit card in the United States.  (Tr. 1666-67).

jury's finding of guilt and represents intentionally false testimony concerning a material matter that could not be ascribed to mistake, inadvertence or faulty memory.

The evidence at trial also irrefutably proved that the defendant committed perjury when he testified—with respect to the filing of the Forms 3520 for Anne Seggerman—that he did not intend to "break the laws of the United States," "try to cover [his] tracks in some type of tax-evasion scheme," "willfully try[ ] to break the rules of the IRS," or "take any action to willfully obstruct the IRS in any way" (Tr. 1879-80). The evidence established that, shortly after learning that Anne Seggerman had been subpoenaed by the IRS, the defendant took steps to falsely and fraudulently portray the transfers of funds from Lixam to Anne as "gifts" made by Müllhaupt as a result of Müllhaupt's detached generosity and desire to provide unsolicited financial assistance to Anne. By re-casting the transfers as gifts to Anne from a generous foreign benefactor enabled the defendant to conceal the illegitimate nature of those unreported money transfers, and his role in repatriating those funds. As a result of his efforts, between 2010 and 2012, the defendant caused the Dworken Hillman accountants and Stein to prepare IRS Forms 3520 for the tax years 2001 to 2010, which falsely reported that the funds transferred to Anne from the trust accounts holding the funds she inherited from her late husband – totaling over $3 million – were "gifts" to Anne from a foreign person. In fact, the proof at trial overwhelmingly established, as the defendant well knew, that the transferred funds were Anne's inheritance from her late husband's undeclared offshore estate.

The jury's finding that the defendant was guilty of Count One established that in causing the filing of false and fraudulent Forms 3520 the defendant in fact intended to "break the laws of the United States, "willfully tr[ied] to break the rules of the IRS," and took "action to willfully obstruct the IRS" and therefore committed perjury in his trial testimony. In other words, those statements are irreconcilably inconsistent with the jury's verdict. In charging the jury, the Court instructed that to find the defendant guilty of Count One the jury had to find that the defendant "knowingly and deliberately engaged in an affirmative act to obstruct or impede a pending or reasonably foreseeable tax related proceeding." (Tr. 2151). By finding the defendant guilty of Count One, the jury necessarily determined that the defendant intended to "break the laws of the United States," "willfully tr[ied] to break the rules of the IRS," and took "action to willfully obstruct the IRS." The defendant's testimony was thereby false and inasmuch as that testimony concerned the defendant's own state of mind – a matter about which he was particularly knowledgeable – the defendant knew at the time of his testimony that it was untrue. Accordingly, this part of the defendant's testimony also constituted perjury.

Finally, the defendant also committed perjury when he falsely testified that he was not "intentionally trying to break any laws of the United States" or "intentionally trying to break the rules of the IRS" when he failed to file his federal tax returns from 2005 to 2010 (Tr. 1901, 1905); that he did not "believe" that he was "under a legal obligation to file any type of tax return with the IRS" (Tr. 1904); that he did not "willfully try to evade or break the rules of the IRS by not filing any tax returns in the years 2005 to 2010" (Tr. 1905); that he did not "willfully violate the rules of the IRS by not filing an FBAR" (Tr. 1905); and that he did not "willfully" try to break the laws of the United States" as he was charged (Tr. 1911). This false testimony relates to the willfulness element of the offenses charged in Counts Two through Eight.

"In the tax fraud context, willfulness is established when the government shows (1) 'the law imposed a duty on the defendant'; (2) 'the defendant knew of [that] duty'; and (3) '[the defendant] voluntarily and intentionally violated that duty.'" *United States v. Gilmartin*, 684 F. App'x 8, 11 (2d Cir. 2017) (summary order).  As the Court instructed the jury in this case, to find the defendant guilty of failing to file tax returns and FBARs, as charged in Counts Two through Eight, the jury had to conclude that the defendant willfully failed to file his tax returns for tax years 2005 through 2010 and at least one FBAR for the years 2007 through 2010.  (Tr. 2152-60, 2161-63).  By finding the defendant guilty of these charges, the jury necessarily determined that the defendant intentionally violated his known duty to file tax returns and FBARs and acted willfully.  That determination was irreconcilably inconsistent with the defendant's testimony regarding his state of mind with respect to his failure to file tax returns and FBARs.  Inasmuch as the defendant's false testimony described above, once again, concerned his own state of mind it is reasonable to conclude that the defendant was well aware at the time of his testimony that the above statements were untrue.

Accordingly, given the numerous instances of perjury in the defendant's trial testimony, the Court should apply the obstruction-of-justice enhancement to the defendant's sentencing calculations, and consider this conduct in its evaluation of the Section 3553(a) factors.

### Mandatory Imposition of Costs

Little was convicted in Counts Two through Seven of willfully failing to file a tax return in violation of 26 U.S.C. § 7203 and of aiding and assisting the preparation of false tax returns, in violation of 26 U.S.C. § 2706.  By statute, any person convicted of those offenses must pay the "costs of prosecution."  *See* 26 U.S.C. §§ 7203, 2706; *see also United States v. Chavez*, 627 F.2d 953, 954–55 (9th Cir. 1980) (concluding that the plain language of the statute "compel[s] the conclusion that the provision is mandatory"); *United States v. Wyman*, 724 F.2d 684, 688 (8th Cir. 1984) (same).

The costs of prosecution include lodging and travel for witnesses and the costs of the transcripts of the trial proceedings.  *See United States v. Stefonek*, 179 F.3d 1030, 1037 (7th Cir. 1999) (concluding that "the term 'costs of prosecution' is most naturally understood as referring to section 1920 costs incurred by the government in successfully prosecuting a criminal defendant").  Title 26, United States Code, Section 1920 allows a judge to "tax as costs," *inter alia*, "[f]ees and disbursements for printing and witnesses" and "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case."

The Government will submit a proposed order for the costs of prosecution, and a declaration in support, under separate cover.

## A Guidelines Sentence is Warranted

The Government respectfully submits that a term of imprisonment within the applicable Guidelines range is appropriate for several reasons.

**First**, the defendant's conduct was sophisticated, long-running, and willful, and consistent with his past behavior. His facilitation of the charged tax evasion scheme involved complex financial transactions, the use of shell entities, and a pattern of lies and deception to conceal the Seggermans' untaxed $14 million offshore inheritance and the defendant's own earnings from the scheme. Among other things, the defendant and Walter Müllhaupt set up and operated Swiss entities and corresponding Swiss bank accounts to hold the Seggermans' inheritance funds and to mask the true owners of the bank accounts. The defendant worked closely with Bob Gordon, a New Jersey accountant, to utilize an otherwise dormant film production company to siphon funds onshore for the benefit of Anne Seggerman. He sought Yvonne Seggerman's assistance to serve as a partner in the film company in order to lend it an air of legitimacy and advised that its tax returns be filed early to avoid requests for the company's balance sheet, all in an effort to minimize the likelihood of IRS detection. He offered to work together with Gordon to set up similar shell entities for the other Seggerman children. And as discussed further below, when he learned of an IRS investigation, he spun a new web of lies, hoping to avoid getting caught.

The idea that the offense represents "aberrant" conduct, as the defendant claims (Def.'s Sub. at 55), is utterly contradicted by the record. For more than a *decade*, the defendant participated in an intentional and well-orchestrated scheme with the explicit goal of violating U.S. tax law. Within the same period, he also entirely disregarded his own obligations to report income and pay tax. His assertion that he has "filed as a UK domicile from 2008 to date," (Def.'s Sub. at 41), is purposely misleading. The facts are clear—despite earning hundreds of thousands of dollars in income while living and working in the United States, the defendant failed to report that income or pay a single cent of taxes to *any* taxing authority. His filing of backdated U.K. tax returns only after his arrest in this case both demonstrates his willfulness in failing to file U.S. tax returns in the first place and represents yet another effort to avoid taking responsibility for his crimes.

The defendant's past conduct in other settings further undermines his claim that the offenses here were somehow anomalous. In his submission, he elides critical facts regarding his first marriage to an American citizen and the Commodity Futures Trading Commission ("CFTC") proceedings against him. Regarding the marriage, as described in detail in the Government's motions *in limine* (Dkt. No. 287, pp. 44-46), in 1972, the defendant submitted a petition for a visa (the "Petition") and later an application for U.S. permanent resident status (the "Application") based on his marriage to Martha Stoker in December 1971. In both the Petition and the Application, the defendant claimed that he resided together with Stoker at an apartment in Manhattan. In fact, U.S. Immigration and Naturalization Service ("INS") officers learned from Stoker that the defendant left Las Vegas only one day after marrying her in December 1971, and that she never lived with the defendant in New York, indicating that the defendant had very likely engaged in a sham marriage for purposes of immigration fraud. In a sworn statement to INS officers in March 1976, the defendant admitted that he had not seen Stoker since he left

14

Las Vegas after the wedding ceremony, that Stoker had never lived in New York, and that he had lied in both the Petition and the Application.  (*See* defendant's sworn statement of March 12, 1976, attached hereto as Exhibit A).  Thus, regardless of whether the defendant intended the marriage to be legitimate, INS records clearly demonstrate that the defendant lied to the U.S. government in order to secure his green card status, which he holds to this day.

The defendant likewise omits highly inculpatory facts regarding the three separate U.S. CFTC proceedings brought against him.  Following a fact hearing in one of those proceedings, the presiding judge issued an Initial Decision and Order finding, among other things, that: (i) the defendant and others at his company, Dover First Commodities, Ltd. ("Dover"), "held themselves out . . . as commodity trading advisors" when they were in fact not registered as commodity trading advisors as required under the Commodity Exchange Act (the "Act"); (ii) the defendant—who testified that he was not required to verbally advise the victim-investor (the "Victim") of the "risks and mechanics of options trading," because the Victim signed a "New Account Agreement Form" containing certain written caveats—violated anti-fraud provisions of the Act; (iii) the defendant—who in response to the Victim's request for the return of funds "stated that he could not render an accounting to [the Victim] due to the fact that he was departing for London on business"—and other Dover employees engaged in unauthorized trading of the Victim's account, in violation of the Act.  (*See* November 14, 1978 Initial Decision an Order of Administrative Law Judge Robert E. Duncan, attached hereto as Exhibit B, ¶¶ 7-8, 10).  This CFTC proceeding was later discontinued as the result of a negotiated settlement with the Victim.  The defendant was ordered to pay reparations to the complainant in a second CFTC matter, and entered into a *nolo contendre* settlement agreement in a third CFTC matter, resulting in restitution of approximately $50,000, a fine of $5,000, and a three-month suspension from futures and commodity trading.

In short, the defendant's crimes in this case hardly represent an aberration.  The offense conduct consumed a substantial period of the defendant's life, and even before he undertook the various schemes detailed during the three-week long trial in this case, he had already engaged in fraud against both the United States and individual victims.  A lengthy sentence of imprisonment is needed to recognize the seriousness of the offense, promote respect for the law, and provide just punishment, and also to deter the defendant from additional criminal conduct.  *See* 18 U.S. Code § 3553(a)(2)(A), (B).

**Second**, the defendant engaged in a significant portion of the charged conduct while barred as an attorney in both the United Kingdom and in the United States, specifically, in New York.  In particular, the defendant leveraged his role as an attorney in attempting to cover up his crimes.  For example, the defendant's letter to James Cosgrove at Dworken Hillman misrepresenting that the transfers from Lixam to Anne Seggerman were gifts from Müllhaupt was written on "Little & Co. Solicitors" letterhead.  (*See* GX 535, at 3, attached hereto as Exhibit C).  The point, of course, was to take advantage of the authority conferred on him by his professional status to cause others to act at his behest.  He not only used his law degree as a sword, but also as a shield.  As demonstrated by the trial testimony of both Doug Stein and Joseph Bainton, the defendant sought to hide behind the attorney-client privilege to prevent the disclosure of incriminating facts to the Grand Jury and to insulate himself from prosecution.

The defendant betrayed the trust placed in him by the New York State bar, and society more generally, by using his office to facilitate and attempt to conceal his crimes. As the Seventh Circuit has reasoned, "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999); *see also* U.S.S.G. § 3B1.3, *Background Commentary* ("persons who . . . abuse their special skills to facilitate significantly the commission or concealment of a crime . . . are viewed as more culpable"). A Guidelines sentence would send a strong message to the legal community that such behavior by attorneys will not be tolerated, and will result in substantial punishment.

In addition, the defendant's claim that the Court should consider the likely loss of his ability to continue practicing law in both the U.S. and the U.K. as a mitigating factor is meritless. (*See* Def.'s Sub at 55). As the Eleventh Circuit has observed:

> Society, employers, and licensing authorities usually view abuse of a position of trust to commit or facilitate crimes as misconduct warranting loss of that position of trust. As a result, in virtually every case in which a § 3B1.3 enhancement is warranted, there will also be a loss of a position of trust. The two sanctions or results are inextricably intertwined.

*United States v. Hoffer*, 129 F.3d 1196, 1205 (11th Cir. 1997) (holding that the district court abused its discretion by granting the defendant a downward departure based on his loss of the privilege to practice medicine, a position that the defendant used to facilitate the offenses of conviction). The defendant most certainly should not be permitted to continue practicing law as the result of his convictions here. But the loss of that privilege is not a collateral consequence, it is a direct consequence of his violation of his ethical and professional duties as an attorney. Accordingly, the Court should reject the defendant's argument that a downward variance is warranted on that ground.

**Third**, the defendant earned substantial income, avoided paying substantial tax, and caused a significant loss to the U.S. government as a result of his crimes. As the evidence at trial established, and as noted above, the tax evasion scheme perpetrated by the defendant and others deprived the IRS of over $4 million in federal tax revenue. For his role in the scheme, the defendant pocketed hundreds of thousands of dollars. Indeed, Henry Seggerman testified at length at trial regarding his surprise at the high fees that he learned were being charged by the defendant, Müllhaupt, and Gordon. Moreover, the defendant failed to pay a penny of taxes on those fees, along with the hundreds of thousands more he earned from his law practice while living and working in New York.

While the defendant may have independently desired to assist Anne Seggerman, ultimately, his crimes were driven by greed.  The defendant's self-enrichment at the expense of other law-abiding taxpayers warrants a Guidelines sentence.[9]

**Fourth**, the defendant has utterly failed to accept responsibility or express remorse for his crimes, despite a years-long prosecution and a three-week long trial detailing his criminal conduct.  The penultimate paragraph of the defendant's sentencing submission perfectly encapsulates his view of this prosecution:

> In respect of the Failure to file charges, no UK resident, holding a legacy green card for entry purposes without a permanent or temporary home in the US has ever been charged with failing to file US tax returns.  In respect of the false statement charges, I mistakenly relied on the advice specialist lawyers provided.  In respect of the conspiracy charge, I allowed myself to be made a scapegoat for the crimes of a family of tax cheats because I kept a promise made to their father on his deathbed.  I am guilty of a lack of good judgment, but not the charged criminal conduct and the Government insinuation of continuing mendacity – is roundly contradicted by the many letters of support supplied by those who know me well.  I respectfully submit I do not deserve to go to prison for these failings and my foolish trust in the unscrupulous.

(Def.'s Sub. at 56).

Two clear themes, both antithetical to acceptance of criminal wrongdoing, emerge from this paragraph, and from the defendant's submission as a whole: (1) despite the overwhelming evidence of his guilt, the defendant somehow views himself as the victim in this case; and (2) to the extent that any crime was perpetrated, it was the fault of everyone but the defendant.  He essentially relitigates the trial, notwithstanding the jury's verdict.  Thus, the defendant continues to assert, variously, that he is a "scapegoat," that Doug Stein and the Seggermans are liars, that Joseph Bainton drank too much causing him to provide poor advice, and that Gordon unilaterally concocted the scheme to repatriate funds through shell entities.  He again contends that he was targeted because Suzanne Seggerman's husband once held a prominent position—stating "[t]hat is why I was arrested" (Def.'s Sub at 50)—without a shred of evidence to support that entirely baseless claim.  He complains that no one else with his particular immigration status has ever been prosecuted for failing to file taxes, notwithstanding that fact that he earned hundreds of

---

[9]   Also of note, despite the defendant's claim that his "finances have deteriorated further, and I am deep in debt," the defendant did not complete the financial statement requested by the Probation Department.  (*See* PSR ¶ 83 ("The defendant was provided with a financial statement to complete and the information remains awaited.")).  As the Court is aware, a defendant's financial situation is typically included in the PSR.  The defendant should not be given the benefit of the doubt on the state of his finances, as he has not provided information to the Probation Department that would allow the Court to assess his financial circumstances.

thousands of dollars while living and working *in New York* for three years.  According to the defendant himself, "I accept no responsibility for engaging in any criminal activity as charged for the simple reason that I did not engage in any criminal activity."  (Def.'s Sub. at 49).

The defendant's absolute unwillingness to accept responsibility and his total lack of remorse are further underscored by his efforts to cover up the tax evasion conspiracy, and his willingness to baldly lie, under oath, from the witness stand, as described in detail above.  His attitude at trial, and even today, remains consistent with the sentiment he expressed to Henry Seggerman after learning of the Government's investigation, "now we'll see if the boat will float."  (Tr. at 653).  The boat, of course, was the tax evasion scheme, and the defendant meant that he hoped that their deception would "stand up to any scrutiny from the government," and "keep [the scheme] from becoming a big criminal disaster."  (Tr. 654).  Notwithstanding his conviction, the defendant continues to hide behind the lies and deceit he engaged in for years, hoping to remain unpunished for his crimes.  This is particularly concerning, given that absent an acknowledgment of wrongdoing, there is little reason to believe that he will abstain from further crimes.

To be sure, the Government does not seek to penalize the defendant for exercising his right to trial.  But "Section 3553(a) is broad enough to allow consideration of factors such as . . . lack of remorse in imposing a sentence."  *United States v. Cole*, 296 F. App'x 195, 198 (2d Cir. 2008).  As the Second Circuit has noted, a "defendant's 'lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public.'"  *United States v. Kaziu*, 559 F. App'x 32, 39 (2d Cir. 2014) (quoting *United States v. Broxmeyer*, 699 F.3d 265, 295 (2d Cir. 2012)).  The Second Circuit has likewise upheld sentences imposed based in part on the defendant's failure to accept responsibility as a factor under Section 3553(a).  *See, e.g., United States v. Kilkenny*, 295 F. App'x 396, 399 (2d Cir. 2008) (upholding substantive reasonableness of sentence in bank fraud case based in part on defendant's "continued failure to accept responsibility for his crimes"); *United States v. Levy*, 385 F. App'x 20, 25 (2d Cir. 2010) (upholding substantive reasonableness of sentence based in part on fact that defendant "not only failed to accept responsibility, but lied under oath about his culpability"); *United States v. Butler*, 733 F. App'x 565, 567 (2d Cir. 2018) (citing defendant's failure to "demonstrate acceptance of responsibility for his crimes" as basis for upholding substantive reasonableness of sentence).

In light of this precedent, it is clear that the defendant's attempt to cover up the tax evasion scheme, his false testimony at trial, and his explicit refusal to accept responsibility or express remorse in his sentencing submission and in the PSR warrant serious consideration under Section 3553(a).  The Government submits that the defendant's conduct in this regard further supports the imposition of a Guidelines sentence in this case.

**Fifth**, the imposition of a term of incarceration is warranted to deter others who would engage in similar misconduct.  Deterrence is important in tax cases generally, but that is particularly so in cases involving the extraordinarily hard-to-detect and underprosecuted conduct in which the defendant engaged: offshore tax evasion.  Such schemes are especially difficult to detect and prosecute because, as in this case, participants in such schemes commonly use sham

entities to insulate themselves, and establish such entities and related bank accounts in foreign countries with laws that generally provide a shield against U.S. law enforcement.

As the Sentencing Guidelines themselves make clear, "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.  Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators."  U.S.S.G. ch. 2, part T (intro. cmt.).

A number of other courts have echoed this theme.  In *United States v. Engle*, the Fourth Circuit observed:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise.  The vast majority of such crimes go unpunished, if not undetected.  Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

592 F.3d 495, 502 (4th Cir. 2010).

Judge Weinfeld articulated the point in a pre-Guidelines setting:

> This court has long had the view that income tax evasion cases where defendants are found guilty . . . require a term of imprisonment.  The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns.  I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States v. Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13) (relevant pages attached hereto as Exhibit D).

In a case involving a defendant who had a secret account in Switzerland containing millions of dollars, Judge Gardephe concurred with Judge Weinfeld's reasoning, stating:

> Our tax system is, at bottom, a voluntary one.  Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct.  I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary

circumstances, cases of significant tax evasion often call for a
sentence of imprisonment. There's nothing about the facts here that
suggest to me that a different outcome is appropriate.

*United States v. Werdiger*, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50) (relevant pages
attached hereto as Exhibit E).

Here, the investigation into the defendant's conduct lasted several years, involved law
enforcement authorities in multiple countries, and consumed substantial Government resources.
Participants in such sophisticated schemes unquestionably perform a cost-benefit analysis
concerning the likelihood and consequences of being caught, and it is therefore important for
such individuals to know that when elaborate tax fraud schemes are pierced, there will be serious
consequences. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.)
("Considerations of (general) deterrence argue for punishing more heavily those offenses that
either are lucrative or are difficult to detect and punish, since both attributes go to increase the
expedited benefits of a crime and hence the punishment required to deter it."); *see also States v.
Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32
month sentence for a tax evader when the district court explained that "a sentence of probation
would not promote respect for the law, but encourage people to flaunt it").

### A Sentence Reduction Based on the Defendant's Age and Health Is Not Warranted

The defendant argues that his age and medical health warrant a departure from the
applicable Sentencing Guidelines range and a lower sentence. This claim is meritless.

Part H of the Sentencing Guidelines provides that departures based upon a defendant's
age and medical health "may be relevant" in imposing sentence, but only when those
characteristics "are present to an unusual degree and distinguish the case from the typical cases
covered by the guidelines." U.S.S.G. §§ 5H1.1, 1.3. The Guidelines note that in the case of a
seriously infirm and/or elderly defendant, home confinement may be as efficient as, and less
costly than, imprisonment. U.S.S.G. §§ 5H1.2, 1.4. However, those statements "suggest[ ] only
that home confinement may be a cost-effective alternative to imprisonment for infirm defendants
or that a judge abuses his discretion if he sentences a defendant with serious health problems to
prison." *United States v. Poetz*, 582 F.3d 835, 838 (7th Cir. 2009).

A defendant who claims an extraordinary medical condition bears the burden of
establishing that such a departure is appropriate because "[t]he general presumption is that the
defendant's circumstances are not unusual enough to justify departure." *United States v. Leiva-
Deras*, 359 F.3d 183, 193 (2d Cir. 2004). Guidelines Section 5H1.4 "restricts departures based
on physical condition to defendants with an 'extraordinary physical impairment,' such as those
which render a defendant 'seriously infirm'." *United States v. Altman*, 48 F.3d 96, 104 (2d Cir.
1995) (quoting U.S.S.G. § 5H1.4). As such, the standard for a downward departure is "strict."
*United States v. Persico*, 164 F.3d 796, 806 (2d Cir. 1999).

The defendant suffered a heart attack in July 2018 and subsequently underwent an
immediate angioplasty procedure. That medical information is described in the defendant's

sentencing submission and in a one-page letter from the defendant's physician, Dr. Samin Sharma, which confirms that the defendant is under his medical care.  Based on our conversation with Dr. Sharma, the defendant's current medical treatment consists of prescribed medication and consultations with Dr. Sharma every four months.  The defendant's heart attack and subsequent medical treatment did not prevent him from making a subsequent, court-approved trans-Atlantic trip to Europe for his son's wedding and the return trip to the United States.  Nor did his health issue apparently interfere with his ability to represent himself in this case and prepare his sentencing submission.   Furthermore, the defendant has produced no evidence that his medical health has resulted in an "extraordinary physical impairment," such as to render him "seriously infirm," *United States v. Altman*, 48 F.3d at 104.  Accordingly, the defendant has not sustained his burden of proving that a departure based on his age and physical health is warranted.

To the extent that the defendant is arguing that the Bureau of Prisons ("BOP") cannot adequately accommodate him and provide him with any needed treatment, the Government notes that in making determinations regarding the appropriate institution in which to house an inmate, the BOP carefully considers the inmate's health status and assigns each inmate a medical "Care level."  (*See* Legal Resource Guide to the Federal Bureau of Prisons (2014) at 25-28).  Inmates with greater medical needs are assigned to those facilities with more comprehensive on-site medical resources.  For example, Federal Medical Centers are prisons that provide in-patient care to seriously ill inmates.  The BOP has seven of these centers throughout the United States.  Furthermore, all BOP institutions contract with medical centers in the local community to provide specialized medical treatment.  Thus, there is no question that the BOP can accommodate the defendant's medical needs.  The defendant's claim, that a sentence of "probation/home detention while residing in the UK would allow [him] superior medical care via the NHS system than that provided by a US Prison," (*See* Little Mem. at 54), even if true, is simply not a basis for granting a departure in this case or imposing a lesser sentence.

## The Cases Cited by the Defendant in Support of a Non-Custodial Sentence are Inapposite

The defendant cites a number of cases in support of his contention that a non-custodial sentence is appropriate here.  Those cases presented materially different considerations than those present here.  Specifically, many of the cases cited by the defendant involve defendants (1) with far lower Guidelines ranges than the defendant; (2) who pleaded guilty and expressed remorse, or (3) who had cooperated with, or otherwise provided assistance to, the Government.

For example, several of the cases cited by the defendant involved defendants with far lower Guidelines ranges than the defendant.  *See, e.g. United States v. Lacey Doyle*, 16 Cr. 506 (ALC) (pleaded guilty and subject to a Guidelines range of 6 to 12 months' imprisonment).

Several of the cases cited by the defendant involved defendants who had pleaded guilty and expressed remorse for their criminal conduct.  *See, e.g.*, *United States v. Chatwal*, No. 14 Cr. 143 (E.D.N.Y.); *United States v. Samson*, No. 16 Cr. 334 (D.N.J. Mar. 6, 2017); *United States v. Warner*, No. 13 Cr. 731 (N.D. Ill.) (pleaded guilty and agreed to pay all taxes, penalties, and interest owed).

Finally, several of the cases cited by the defendant involved defendants who had cooperated with, or otherwise provided assistance to, the Government. *See United States v. Shamilzadeh*, No. 04 Cr. 1094 (E.D.N.Y.) (received a Section 5K1.1 letter for "his substantial assistance to the government in the investigation, prosecution and conviction of seven other individuals for serious felony offenses") (Exhibit F); *United States v. Martin Lack*, 11 Cr. 60184 (S.D. Fla.) (received a Section 5K1.1 letter); *United States v. Renzo Gadola*, 10 Cr. 20878 (S.D. Fla.) (received a Section 5K1.1 letter); *United States v. Christos Bagios*, 12 Cr. 60260 (S.D. Fla.) (received a Section 5K1.1 letter).

In the case of defendant Kenneth Heller, who was sentenced by Your Honor, the sentencing transcript indicates that the defendant, although not the recipient of a Section 5K1.1 letter, "did provide assistance, through his lawyers, with respect to the techniques of Swiss bank and Swiss bankers in helping U.S. taxpayers get funds back to the U.S. through corresponding accounts, and specifically his assistance helped established venue in the Southern District of New York with respect to an indictment returned by the grand jury earlier this month." *United States v. Kenneth Heller*, 10 Cr. 388 (PKC) (Exhibit G).

In short, the cases do not support the defendant's argument for a non-custodial sentence, especially given that his criminal conduct spanned a decade, the loss to the Treasury as a result of his conduct was high, the defendant perjured himself at trial, and he continues to express absolutely no remorse, and take no accountability, for his actions.

## <u>Conclusion</u>

"Taxes," wrote Oliver Wendell Holmes, "are what we pay for civilized society . . . ." *Compañía General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting). This country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status. That system would crumble if taxpayers thought they could cheat with impunity and face little or no consequence. The Government simply cannot ensure compliance with the Internal Revenue Code if the general public believes there are no meaningful repercussions for failing to comply with tax laws and regulations. A significant period of incarceration is essential in a case like this, lest the fraud perpetrated by the defendant breed skepticism and bitterness among hard-working taxpayers who fulfill their tax obligations by paying their taxes honestly. Absent such a strong message, others may be emboldened to engage in similar crimes, knowing that tax evasion schemes are difficult to detect and that, even if they are caught, they will not face significant punishment.

Accordingly, for all of the reasons stated above, the Government respectfully submits that a term of imprisonment within the Guidelines range is warranted to reflect the seriousness of the defendant's offense, to promote respect for the law, and to afford adequate deterrence against further crimes by similarly situated offenders.

Sincerely,

GEOFFREY S. BERMAN
United States Attorney

by:  _____/s_____
Andrew Dember/Christopher DiMase/Dina McLeod
Assistant United States Attorneys
(212) 637-2563 / -2433 / -1040

cc:   Michael Little (by ECF and e-mail)
Sean Maher, Esq. (by ECF and e-mail)
U.S. Probation Officer Walter Quinn (by email)