**MICHAEL J. LITTLE
THE TOWER HOUSE
MICHELDEVER STATION
HAMPSHIRE SO21 3AL
UNITED KINGDOM**

April 9, 2021

<u>By ECF & EMAIL</u>

The Honorable P. Kevin Castel
United States District Judge
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

> Mr. Little, a highly intelligent man who until his conviction was an admitted attorney, made a knowing, intelligent and voluntary decision to represent himself in this case. Nothing was overlooked in this Court's April 1, 2021 Order (DE 492). No new, material evidence that would likely result in an acquittal has been presented. The motion (DE 493) is DENIED. SO ORDERED.
>
> *P. Kevin Castel*
> P. Kevin Castel
> United States District Judge
> 4/20/21

**Re:** Defendant's 2nd Application for a New Trial and Request for Reconsideration of April 1, 2021 Restitution Order, grounded on Newly Discovered Evidence, Pursuant to the Provisions of F.R.Crim.P. Rule 33 and 52(b).
*United States of America v. Michael Little* Docket No. 12-cr-0647 (PKC)

Dear Judge Castel,
.
     I respectfully submit, for the reasons more fully detailed in this letter motion, the prayer that the Court vacate Judgment [Dkt.# 449, 11/20/2018] in this matter, reconsider and stay its Order of Restitution [Dkt.# 484, 1/6/2021], and order a new trial. This application is grounded on newly discovered evidence, pursuant to the provisions of F.R.Crim.P. Rule 33 and 52(b).

NEWLY DISCOVERED EVIDENCE

     1. On March 30, 2020, I was informed by the United Kingdom's Competent Authority a "decision had been reached between the UK and the United States in accordance with Article 26 of the United Kingdom/ USA double taxation convention in relation to your residence status for the purposes of the convention ["the Treaty Decision"].[1]."

     2. The government confirmed, in their restitution brief, **the fact** the Seggerman Siblings, through their Swiss lawyer Dr. Walter Müllhaupt, a mere nominee and sole named trustee, ordered the dissolution of the Pizita Trust an entity funded by their untaxed inheritance, The Siblings transferred 'in excess of $1,700,000' to themselves, in January 2020[2]. This proves, for the first time, the Pizita Trust, was at all times controlled by the Siblings for **their** benefit, contrary to the fiction of their testimony at trial: that the proceeds of Pizita were held it on trust for their disabled sister, Patricia

---

[1] 3/30/2020 Email from [then] UK Competent Authority, Carmel Aldridge, to defendant; attached as an addendum to defendant's counselled appellate reply brief: 18-3622, No. 146 pp 150 *et seq.* Attached as Exhibit A hereto.
[2] Government Restitution Brief, Dkt. #489 page 3.

1

DISCUSSION

The new evidence contained in the Treaty Decision debunks the government's allegations, in respect of Counts 2-8, as a matter of both fact and law. The Court previously described aspects of the conspiracy allegation, Count 9, to be a "myth" and "a false narrative[3]". Counts 1 and 10-19 were shrouded in sufficient confusion at trial for the Court to observe: "we're marching toward a mistrial[4]".

Combined, these reasons and in particular, the new evidence's confirmation of the correct application of Treaty law, new evidence of witness perjury at trial, the application of the rule of lenity in the light of the ambiguity of the law, and the interests of justice, militate for the Court to vacate judgment and order a new trial.

"[A]…defendant's motion for a new trial pursuant to Rule 33…. requires that: (1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal. *See e.g., United States v. Jasin*, 280 F.3d 355, 361 (3d Cir.2002); *United States v. Metz*, 652 F.2d 478, 479 (5th Cir.1981)"
*U.S.A. v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007).

"A federal court of appeals normally will not correct a legal error made in a criminal trial unless the defendant first brought the error to the trial court's attention. *United States* v. *Olano*, 507 U. S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508. But Federal Rule of Criminal Procedure 52(b) provides an exception, permitting "[a] plain error that affects substantial rights [to] be considered even though it was not brought to the [trial] court's attention."
*Henderson v. United States*, 568 U.S. 266, 266 (2013).

THE GOVERNMENT CASE

At trial, the government 'loaded the bases' by having twelve witnesses testify as to my guilt in respect of counts one[5] through eight. The jury was also shown a three-hour deposition[6] of the director of the successor corporation[7] to my family trust. The law, as charged by the Court, was founded upon the government's subjective interpretation of the complex intersection of the IRS Code for green card holders and the controlling statutory provisions of the US/UK Tax Treaty ["the Relevant Law"].

The government's interpretation of the law pivoted on its premise, founded on agency discretion, that the failure of a dual resident, irrespective of whether he actually has a home, or lives in the US, to notify the Secretary of the Treasury of a treaty position, deprives the

---

[3] 10-cr-948 (PKC), Dkt. #53, page 37

[4] Tr. 1754.

[5] Count One was modified to apply only to Counts 10-19 subsequent to the decision in *Marinello*, decided during the trial, Tr. 279 *et seq.*

[6] The shown version was slightly shorter than the unedited 3 hours.

[7] Peahen Investments Ltd., a corporation into which investments belonging to my wife and I were placed, on the advice of Rabobank, the corporate trustee, in 2000. The court suggested to the jury Peahen [without specifically naming it] was a 'sham' Tr. 2190. Adding to the confusion, the jury had only heard the words 'sham' mentioned adjectively in respect of Steiner Productions, Tr. 1668, 1847, 18848. . Donna Francis in deposition and declaration confirmed Peahen was neither a 'sham' nor under my control. Dkt. 306, pp. 104, 150; 2/12/2018.

dual resident of treaty benefits and thus peremptorily requires the filing of a Form 1040 and the disclosure of worldwide income. This is not the law.

Early in the proceedings, he government furnished particulars narrowing the indictment's charges, with specificity, for counts two through seven, to the defendant's failure to file Form 1040. [September 5, 2013 Status Conference, Tr. 51]. Accordingly, the government had to prove I was legally a tax resident of the US for the years 2005-2010. The government, at trial, further confirmed the failure to file charges **were limited** to failing to file Form 1040. [Tr. 1171]. Therefore, my conviction, for failure to file Form 1040, must, by application of the legal analysis supporting the Treaty Decision be found to be unsafe, and my conviction vacated for years 2008-2010.

The Treaty Decision's analysis of the tie-breaker rules concluded my requirement to file Form 1040 ceased when I gave up my apartment and left the US in September 2008. "[my income was] taxable only in the US for the period 2005 through to September 2008. From September 2008 through to 2010 the income derived from your business dealing are taxable only in the UK[8]".

After September 2008 I was no longer a resident of the US notwithstanding my possession of a green card. In addition, as a non-US resident I had no obligation to file an FBAR and thus count eight was also incorrectly charged to the jury.

But in particular, the Competent Authorities' analysis underscored the difficulty encountered in allocating my Centre of Vital Interests [COVI} to the US for the years 2005[9] through September 2008, in turn casting doubt on the framing of the jury charge.

"It is **difficult to decide either way** whether you have a COVI in the UK or USA….. It is my opinion that taken as a whole the COVI test is inconclusive. My view was accepted by the US competent authority and we considered the next test".[Emphasis added] Had my COVI been decided as the UK, the analysis would have concluded non-resident for the entire period 2005-2010 and accordingly had no requirement to file Form 1040 or FBAR's at all.

The jury, however, were not apprised of the tie-breaker analysis but were ordered to examine whether, I had been "wilfully blind" and/or "consciously avoided a known legal duty["Tr.2157, 2164,2183 ]in my failure to file Form 1040,

The Treaty and its provisions [including the IRS's Technical Explanation] override the Tax Code and the Competent Authorities have been granted the **exclusive**[10] authority by Congress to determine tax treaty claims. My treaty claim was timely filed within the six-year limitation period. I relied on the UK Competent Authority's advice, provided to me by way of a Certificate of Residence in April 2013[11]: [I was] tax resident in the UK for the years 2005 -2010. That I lawfully filed returns only in the UK for the years 2008-2010, was confirmed, in part, by the Treaty Decision and casts doubt on any 'conscious avoidance'.

Furthermore, the Treaty's Technical Explanation, officially incorporated as part of the Treaty, clearly states the US has no authority to impose its domestic statutory provisions on a green card holder who no longer has a residence in the US if those provisions are in conflict with the Treaty[12]. And the government's attempt to apply domestic law residency provisions

---

[8] 18-3622, No. 146 page 152.

[9] HMRC's MAP analysis, proposed to the IRS in negotiations confirmed my submission I was UK tax resident in 2005. This was subsequently modified in the Competent Authorities joint decision. Dkt. #462-2; 1/16/2019.

[10] Dkt. # 464-3, page 4; Treaty Technical Expl. Art.1 §3.

[11] Dkt. #58-1; 5/1/2013.

[12] Dkt. # 464-3, page 4; Treaty Technical Expl. Art.1 §4.

to a green card holder residing permanently outside the US is in direct conflict with Treaty Article 4's purpose: to allocate a single state of residence[13].

THE TREATY DECISION

Here, the law as presented to the jury at trial – a confluence of Treaty provisions and IRS Code – was, it is submitted, both complex and contradictory. The Court, itself, confirmed complexity: "*I have some questions regarding the failure to file charge against Mr. Little. Looking at 26 U.S.C. Section 7701(b)(1)(A) and thinking about this all, it seems to me that I need some help*" [Tr. 1169].

In response to the Court's question, the government rehearsed arguments first set forth in opposition to my motion to dismiss[14] and further confirming its subjective, discretionary interpretation of the law: that the failure of a dual resident of the US and the UK to notify the Secretary of the Treasury of a Treaty position would, without exception, deprive the dual resident of substantial treaty benefits and peremptorily required the filing of a Form 1040 and, as a consequence of having to file a 1040, an FBAR.

And consciously avoiding notifying the Secretary would expose the dual resident to criminal charges if the failure was found to be deliberate, resulting, as in the instant case, in both criminal misdemeanour charges and criminal felony charges where 'foreign' bank accounts were not reported on Form 1040[15].

The Treaty Decision confirms the IRS's position is not good law. However, the Court relied on the government's subjective interpretation of the Relevant Law, to (i) deny defendant's motion to dismiss counts one through eight; and (ii) charge the jury at trial. The Treaty Decision confirms defendant's earlier arguments that the Court's application of the law, pre- post-and during trial was in error.

The IRS has previously and unsuccessfully averred, in a Federal Court application, it has the power, through agency discretion, to deny Treaty benefits and such a decision is not subject to judicial review:

> [The IRS also] contends that the Court may not review the U.S. Competent Authority's decision to deny Starr benefits under the Convention because to do so would run afoul of the political-question doctrine. That doctrine, like the committed-to-agency-discretion principle, is a "narrow exception" to federal courts' duty to decide cases properly before them. *Zivotofsky ex rel. Zivotofsky v. Clinton,* ––– U.S. ––––, 132 S.Ct. 1421, 1427, 182 L.Ed.2d 423 (2012).
> *Starr Int'l Co. v. United States*, 139 F. Supp. 3d 214, 229-30 (D.D.C. 2015)

The District of Columbia District Court disagreed:

> " This Court has already determined that the discretionary provision—read in conjunction with the Technical Explanation—provides a sufficiently manageable standard for judicial review. " *Id* at 230.

---

[13] *Ibid* Art. 1 §1; Art.4 §4.
[14] Dkt. #220; 1/18/2017.
[15] The Form 1040NR, in contrast to Form 1040, does not require a non-resident to disclose details of the bank accounts he holds in his home country.

Here, the Treaty Decision confirms the Alice-in-Wonderland absurdity that the IRS, wearing its prosecutorial hat, can advance, by criminal complaint,[16] an allegation that a dual resident, pursuant to the Code is a US resident [thus liable to tax on world-wide income]. And yet, on the same facts and wearing its Competent Authority hat, the IRS can find the same dual resident is a UK resident and therefore not liable to pay US tax[17].

When denying my 2017 motion to dismiss Counts 2-8[18], the Court held, *inter alia*, "26 U.S.C. § 6712(c) […] expressly states that "[t]he penalty imposed by this section shall be in addition to any other penalty imposed by law." This meant that, in addition to a $1,000 penalty, criminal charges could be brought for failures to disclose Treaty positions on Form 8833. But Congress is explicit when a reporting failure results in criminal sanctions [see 26 U.S.C. § 6677]. But this is not the law.The Code **exempts** dual residents from the requirement to file **Form 8833** if their reportable income is less $100,000.

" Reporting is waived for an individual if payments or income items otherwise reportable under this section (other than by reason of paragraph (b)(8) of this section), received by the individual during the course of the taxable year do not exceed $10,000 in the aggregate or, in the case of payments or **income items reportable** only by reason of paragraph (b)(8)[19] of this section, **do not exceed $100,000 in the aggregate.**" 26 C.F.R. §§ 301.6114-1[Emphasis added].

It is submitted that any fair reading of the applicable statutes and regulations **does not make clear** that failure to file documents in support of a treaty position exposes a non-resident taxpayer to criminal prosecution. In addition, the application of the rule of lenity to such an extraordinary expansion of civil to criminal penalties would, it is submitted, be sufficient to successfully challenge any criminal charge brought pursuant to the ambiguous provisions of § 6712 (c).

THE TREATY PROVISIONS

The Treaty's provisions and its official Technical Explanation [Fn. 13 *supra*], incorporated by reference herein, confirm " a dispute concerning whether a taxation measure[20] is within the scope of the Convention, **shall be considered only** by the competent authorities of the Contracting States, and the procedures under Article 26 (Mutual Agreement Procedure) of the Convention **exclusively** shall apply to the dispute." [Emphasis added] See Fn.11, *supra*.

Furthermore, as in the instant case, the Treaty prevents the government from using IRS Code provisions to unilaterally determine a green card holders' status as US resident and

---

[16] In the instant case, the wilful failure of a dual resident to file tax returns Count 2-7, a misdemeanour, and such failure consequently resulting in a felony charge of failure to file an FBAR.

[17] On presentation of a UK Mutual Assistance Protocol request by the UK Competent Authority, the IRS confirmed that for over two of the charged years I was not a US resident and therefore not liable for US tax, required to file Form 1040, or an FBAR for the years 2008 through 2011,

[18] The arguments put forward in defendant's applications in respect of dismissal of Counts 2 -8 in Dkt. No.s 215,223,230,232,239 and 242 are incorporated by reference to this letter-motion.

[19] For returns relating to taxable years for which the due date for filing returns (without extensions) is after December 15, 1997, that **residency of an individual is determined under a treaty and apart from the Internal Revenue Code**." 26 C.F.R. §§ 301.6114-1(b)(8) [Emphasis added].

[20] "… a measure is a law, regulation, rule, procedure, decision, decision administrative action, or any similar provision or action." Treaty Article 3(b)

peremptorily require the filing of a Form 1040. The government cannot vitiate the treaty benefits that exempt a non-resident green card holder from US income tax filing requirements:

"…"residence" is determined under Article 4 (Residence). Thus, an individual who is a U.S. resident under the Internal Revenue Code but who is deemed to be a resident of the United Kingdom under the tie-breaker rules of Article 4 would be subject to U.S. tax only to the extent permitted by the Convention. For example, if an individual who is not a U.S. citizen is a resident of the United States under the Code, and is also a resident of the United Kingdom under its law, and that individual has a permanent home available to him in the United Kingdom **and not in the United States**[21]**,** he would be treated as a resident of the United Kingdom under Article 4 and for purposes of the saving clause. The United States **would not be permitted to apply its statutory rules** to that person if they are inconsistent with the treaty." *Ibid* Art.1 §4. [Emphasis added]

Even assuming, *arguendo*,[which is not accepted] the Court's application of the IRS Code was legally correct at the time of trial, the government conceded, on appeal, that confusion could arise due to the tension between the application of the Code and Treaty provisions:

"When it adopted the lawful-permanent-resident test, Congress was aware that this test **"could cause an alien to be a U.S. resident, while 'tie-breaker' rules in an income tax treaty could indicate that the alien is a resident of the treaty partner.**" H.R. Rep. No. 98-432,pt. 2, at 1528 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697, 1167 (citing Article 4 of the U.S. Model Income Tax Treaty). In such circumstances, **Congress did not intend to override commitments made in tax treaties**. *Id.* To the contrary, Congress recognized that "in such a case, **the treaty definition will prevail, and such an alien will not be taxable as a resident of the United States**." 18-3622 Doc. 112 pp. 66,67.

Neither the District Court nor the Appellate Court had the advantage of hearing the above Tax Treaty/IRS Code arguments because the Treaty Decision's transmission was received long after the Appellate Briefs and Response were filed.[22] It is submitted both the District's Court's jury charge and the holding of the Appellate Court would have been materially different had the Treaty Decision been decided before trial.

The Treaty Decision, in particular its reference to the difficulty in deciding COVI, casts doubt on the Appellate Court's conclusion the jury could [reasonably] find my decision not to file US returns wilful and also support a conclusion I consciously avoided a known legal duty *Id* Doc. 162-1 page 7.

"Plain error review applies equally where the defendant did not object before the trial court because he failed to recognize an error, and where the defendant did not object because the trial court's decision was correct at the time but assertedly became erroneous due to a supervening legal decision. *See Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). In all cases, we look not to the law at the time of the trial court's decision to assess whether the error was plain, but rather, to the law as it exists at the

---

[21] I cancelled the lease on my NY apartment and had no permanent home in the US after September 2008. GX 1700.

[22] The Treaty Decision was attached as Addenda to Appellant's reply brief but could not be considered by the Appellate Court.

time of review. *See Henderson,* 133 S.Ct. at 1129–30. In other words, a decision of the trial court that was perfectly proper when issued may nonetheless be considered "plainly erroneous" on appeal due to a supervening change in the law."
*United States v. Vilar*, 729 F.3d 62, 70-71 (2d Cir. 2013)

The Treaty Decision, rendered in time for insertion as an Addendum for Appellant's appellate reply brief is newly discovered evidence. The Court of Appeal remanded restitution.[23]. It is submitted the Treaty Decision provides the Court, in effect and by analogy, with a supervening and precedential change in the law and accordingly the judgment should be vacated and a new trial ordered. In short, the IRS cannot pre-empt the authority of Congress, derived through subsidiarity to the Competent Authorities.

As stated above. the government's case at trial, hammered home, by oral and documentary evidence, stated I was a sophisticated international tax cheat. The Treaty Decision lays the lie to this part of the government's submissions.

My use of an offshore corporation[24] to minimise my tax liabilities was calculated to make me out to be a social pariah. For this to be true it had to be proven that the law, as applied to the facts, was clear. But the law as submitted to Court and through the Court to the jury was not governing law or even good law, as fully documented above.

The remaining charges were presented to the jury as the actions of a man with a history of sharp practise in his own tax affairs, sharp practise that trespassed into the criminal. This false narrative, it is submitted, so polluted the jury's ability to weigh evidence concerning the remaining charges, that a retrial is mandated.

RECONSIDERATION OF THE RESTITUTION ORDER

My application and reply brief to the government response, requesting a stay of Restitution, denied by the Court on 4/1/2021, Dkt. # 492 are incorporated herein by reference. Pursuant to the provisions of Local Civil Rule 6.3, I respectfully request the Court reconsider its 4/1/2021 Order.

Notwithstanding the Court's view of the limited nature of the Appellate Court's remand, the fact of the dissolution of the Pizita Trust and the transfer of the substantial funds directly to the Siblings raises the issue of the perjury of Yvonne Seggerman and her siblings at trial. The perjury was reinforced by its endorsement by the government in its response: "While the Seggerman siblings served as trustees for the Pizita Trust, they had **no ownership interest or rights to the funds** contained therein. (*See* Tr. 241,247)". Dkt. #489 page 2.[Emphasis added].

The above quote from the government response was preceded by its description of the "[Trust] was one of those accounts and it was set up in Switzerland by Dr. Müllhaupt to maintain and invest the funds inherited by Patricia Seggerman, the mentally and physically handicapped eldest Seggerman child. (*See* Tr. 170-71, 617, 751, 763)" *Id.*

But Yvonne's statement 'there were four trustees of Patricia's trust, Henry, myself, Suzanne and John' is a flat-out lie. The Siblings and their families were all beneficiaries who had absolute control over that portion of their father's inheritance held by Dr. Müllhaupt but

---

[23] The government avoided reversal by 'dropping' the $134k Tax Treaty claim to conserve court resourses..

[24] "more than half of the profits U.S. corporations report from overseas investments come from tiny tax havens, including places like Bermuda and the Cayman Islands where they have no real business at all" NY Times, 4/9/2019 '*Biden, Yellen and the War on Leprechauns'* Paul Krugman.

7

controlled by Siblings, primarily through Henry and John. This fact was not known at trial because Pizita's liquidation neither taken place nor its proceeds distributed to the Siblings and therefore could not be proven.

It is submitted, that the self-serving statements of Yvonne and her brother and sister could not be impeached at trial. Thus, the reality of ownership, beneath the façade of trust documents and nominees, would remain hidden. The evidence of ownership and transfer to the Siblings is not solely a vehicle for impeachment. It speaks to a core element of the conspiracy as alleged by the government: that I participated in the second half of the Four Seasons meeting where the distribution of the Cetura assets was discussed.

Suzanne and her sister stated I attended the second half, their brothers said I did not. No documentation was presented that indicated my participation, either financially or in the administration of the Pizita Trust. Concrete evidence of the surreptitious distribution of Pizita assets, after trial and sentencing of which I had no knowledge until late in 2020 would powerfully argue toward my acquittal on the conspiracy charge.

"[W]hen the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury ." Accordingly, to succeed on a motion for a new trial based on perjury, a defendant must show that: (1) "the 'newly discovered evidence' could not with due diligence have been discovered before or during trial"; (2) "the evidence demonstrates that the witness in fact committed perjury "; (3) "the newly discovered evidence [is] material"; and (4) the newly discovered evidence is not cumulative. In other words, "[f]or Rule 33 motions based on newly discovered evidence of perjury, the defendant must, among other things, pass two threshold inquiries—he must present some newly discovered evidence and must prove that 'the witness in fact committed perjury.'
*United States v. Bout*, 144 F. Supp. 3d 477, 484 (S.D.N.Y. 2015)

Here, evidence as to the true controllers and recipients of the liquidated Pizita funds could not be discovered at or during trial. It demonstrates perjury on the part of Yvonne and her siblings and it is both material and non-cumulative. A new trial would allow the truth to emerge and the government sanctioned perjury of the Siblings adduced. The interests of justice demand that because of the equipoise of evidence regarding the attendance at the second part of the Four Seasons meeting, and proof of the perjury of the Siblings, in particular regarding the Pizita Trust, would lead to an acquittal.

CONCLUSION

My lack of trial experience left many stones unturned and loose ends hanging during my trial. Evidence that would have impacted the jury's view of the case cannot be considered by this Court because it was available, but not accessible by me. Harry Seggerman's taking of a $2 million management fee from Gullworthy, five days before his death, Saul Bienenfeld's copy of the Stein 'trust' email and his email to Bainton explaining why he stopped working on the case 'because the client told me to'.

All these errors I considered at my leisure during my 17 months in the Pennsylvania countryside. That I failed to present a sufficiently robust defence to persuade the jury of my innocence can only be laid at my door. That I may have been guilty of various lapses of judgment in my attempt to honour a promise made to Harry Seggerman on his deathbed is beyond cavil, however none of my actions crossed the bright line separating foolishness from criminality.

      For the above reasons, I repeat the prayer that the Court grant this application to vacate the Judgment and order a new trial,

                           Respectfully submitted,

                                            /s/   M. J. Little
                                                Michael J. Little, *Pro Se*

cc:      AUSA Christopher J, DiMase. via ECF
           Sean Maher, Esq. via ECF

# EXHIBIT A

Case 1:12-cr-00647-PKC Document 493 Filed 04/09/21 Page 11 of 15

ADD-1



Mr M Little
The Tower House
Micheldever Station
WINCHESTER
SO21 3AL

**BAI – Personal Tax International**
**HM Revenue and Customs**
BX9 1AU
United Kingdom

**Phone**  +44 (0) 3000 547 251

**Email**   ukmap.individuals@hmrc.gov.uk

**Web**    www.gov.uk

Date 30 March 2020
Our          CS&TD/Little/MAP/SFT
Your ref

Dear Mr Little

**Request for Mutual Agreement Procedure Assistance in accordance with Article 26 of the United Kingdom/ USA Double Taxation Convention.**

Following further discussions with the IRS, we have reached a decision regarding your application under the Mutual Agreement Procedure.

I have outlined below the decision reached between the UK and the United States in accordance with Article 26 of the United Kingdom/ USA double taxation convention in relation to your residence status for the purposes of the convention. .

As I have previously explained (my letter of 16 January 2019 refers) it has been necessary to consider where you are treaty resident in accordance with Article 4(2) for the period 2005 through to 2010 (US tax years). The treaty provides for a tie breaker test to be used in cases where it is not conclusive where an individual is resident. The four elements of the tie breaker test have been explained in my earlier letter and include;

- Permanent home
- Centre of vital interest (COVI)
- Habitual Abode
- Nationality

The tie breaker elements are considered separately in order shown above. If the element is inconclusive then we move to the next element. If all elements are inconclusive then it is up to the respective competent authorities to decide.

I have previously set out the considerations regarding each of the tie breaker test but for completeness I have repeated my views below.

**Permanent Home.**
I consider you have a permanent home in both states, firstly in the US during the period from at least June 2005 through to September 2008 when you vacated the apartment in New

---

Information is available in large print, audio and Braille formats.
Text Relay service international number – +44 151 494 1260

»FF                                                                                     Head of Business: Sarah Kelsey

York and terminated your lease. Secondly, I do not consider based on the information you have provided that you had a permanent home in the US from September 2008, when you returned permanently to the UK.

This was agreed by both competent authorities and the next test was considered.

**Centre of Vital Interest**
This test focusses on where your social and financial ties are closer and it is necessary to look at the facts and to examine the circumstances as a whole.

It is apparent that you have family connections in the UK as well as other social connections but that you also had social connections in New York.

From a financial side during 2005 through to 2010 you appear to have earned income in the USA from either fee income or alternatively bank interest. This is evidenced by exhibit 400 which was submitted into evidence during your court hearing. From September 2008 when you returned to the UK the income generated in the US appears to have arisen through your business activity in the UK.

It is difficult to decide either way whether you have a COVI in the UK or USA. On the social side it may be swayed to the UK but on the financial side it is swayed to the US especially in the years 2005 to 2008.

It is my opinion that taken as a whole the COVI test is inconclusive. My view was accepted by the US competent authority and we considered the next test.

**Habitual Abode**
This test requires the determination of whether a person lived habitually in one of the two countries. Having looked at the facts, you have spent a considerable time in the US especially in the years 2005 through to 2008. For the other years 2009-2010 your habitual abode is closer to the UK. This is based on the number of days you spent in the US. I have assumed any days not in the US would be counted as days in the UK.

I have concluded that you are treaty resident in the US during the years 2005 to 2008 and UK treaty resident in the other years covered by MAP (2009 & 2010).

This was agreed by both competent authorities and the tie breaker test was concluded at this point.

Following the conclusion of the negotiations with the US competent authority it has been agreed that for the purposes of the tie breaker test you are considered to be treaty resident in the US by virtue of the habitual abode test for the period 2005 through to September 2008. From September 2008 through to 2010 you are considered to be treaty resident in the UK by virtue of the habitual abode test.

Having considered you are treaty resident in the US, the income received for services rendered in the US (your business profits) is taxable in the US in accordance with Article 7. Article 7 states

*"The business profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. If the enterprise carries on business as aforesaid, the business profits of the enterprise may be taxed in the other State but only so much of them as are attributable to that permanent establishment."*

Article 3 (definitions article) of the UK/US convention describes an "enterprise of a contracting state" is an enterprise carried out by a resident of the contracting state.

Since under Article 4 you are regarded as treaty resident in the US in accordance with the convention it has been agreed that income derived by your business dealings in the US are

2

taxable only in the US for the period 2005 through to September 2008. From September 2008 through to 2010 the income derived from your business dealing are taxable only in the UK.

For the purposes of calculating the level of profit taxable in either state for 2008 (US tax year) it has been agreed to pro rata the income based on 247 days (US) /118 days (UK). A copy of the amounts taxable in the United States is enclosed.

This decision concludes the request for assistance under Article 26 of the UK/USA double taxation convention.

Yours sincerely

*Cm Aldridge*

**Mrs Carmel Aldridge**
H M Inspector of Taxes
Competent Authority, United Kingdom.

**Income Summary 2005 – 2010**

| Source of Income | 2005 | 2006 | 2007 | 2008 |
|---|---:|---:|---:|---:|
| Grais & Ellsworth LLP | | | | $13,534.00 |
| Investors capital Mgmt Inc | | | | $600.00 |
| Suffolk County national Bank | | $39.00 | $277.00 | $3,739.00 |
| Optimark Inc | | $1,450.00 | | |
| Shelving Rock Partners LLC | | | | $1,500.00 |
| BHS Residential Sales | | | | $6,495.00 |
| Bainton McCarthy LLC | | | $79,600.00 | $8,890.49 |
| Stuart Pivar | | | $15,000.00 | $7,000.00 |
| Yale University | | | | $34,000.00 |
| Amy Pivar | | | $46,748.41 | |
| Lixam | $25,835.35 | $30,706.97 | $30,305.75 | $31,944.86 |
| **Total per year** | **$25,835.35** | **$32,195.97** | **$171,931.16** | **$107,703.35** |

| | |
|---|---|
| | **Taxable solely in the US** |

| | |
|---|---:|
| Taxable in the US (247/365) | $72,884.18 |
| Taxable in the UK (118/365) | $34,819.17 |

Case 1:12-cr-00647-PKC   Document 293   Filed 04/09/21   Page 15 of 15
Case 18-cr-00647-PKC   Document 248-01 Filed 09/28/21 Page 54 of 55

ADD-5

| 2009 | 2010 |
|---|---|
| $127,737.00 | $15,716.00 |
|  |  |
| $1,161.00 |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| $32,345.28 | $157,623.44 |
| **$161,243.28** | **$173,339.44** |

**Taxable solely in the UK**